NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0530n.06

No. 21-3090

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

DAYTON VETERANS RESIDENCES
LIMITED PARTNERSHIP, dba Freedom's
Path at Dayton, a Florida limited partnership
authorized to do business in the State of Ohio,

      Plaintiff-Appellant,

v.

DAYTON METROPOLITAN HOUSING
AUTHORITY, an Ohio public housing
authority, dba Greater Dayton Premier
Management,

      Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Nov 19, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

OPINION

Before: MOORE, KETHLEDGE, and DONALD, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Seeking to provide housing for disabled homeless veterans in the Dayton, Ohio area, a private developer contacted a local public housing authority for assistance in securing federal subsidies essential to the project's success. The housing authority refused, and the developer sued it for violations of the Americans with Disabilities Act (ADA) and Fair Housing Act (FHA). A district judge initially denied the housing authority summary judgment on the developer's reasonable-accommodation claim, finding that the developer requested an accommodation for disabled persons that a jury could find reasonable. Following the initial district judge's recusal, the successor judge sua sponte reversed on an issue not raised in the initial summary-judgment briefing. Finding there was no causal nexus between

the proposed tenants' disabilities and the developer's requested accommodation, the successor judge entered judgment in the housing authority's favor. We hold that a reasonable jury could find that the developer's proposed accommodation was necessary to ameliorate the effects of homeless veterans' disabilities. Accordingly, we REVERSE.

## I. BACKGROUND

### A. Factual Background

Dayton Veterans Residences Limited Partnership, an organization doing business as Freedom's Path, planned to develop approximately sixty units of affordable housing for homeless veterans near the Veterans Affairs Medical Center in Dayton, Ohio. R. 6 (Am. Compl. ¶ 5, 15) (Page ID #48, 50). In late 2011, the U.S. Department of Veterans Affairs awarded Freedom's Path an Enhanced-Use Lease for a tract of land on the campus. R. 43-16 (Enhanced-Use Lease at 1) (Page ID #1743). To build the housing units on that land, Freedom's Path needed to obtain low-income housing tax credits from the Ohio Housing Finance Authority (OHFA) and rental subsidies from the U.S. Department of Housing and Urban Development (HUD). R. 31-1 (Taylor Dep. at 33) (Page ID #520). Defendant Greater Dayton Premier Management (GDPM) serves Dayton as its public housing authority and administers HUD grants. R. 43-12 (Heapy Dep. at 8–9) (Page ID #1516).

Freedom's Path sought rental subsidies called project-based vouchers, which HUD's Veterans Affairs Supportive Housing (VASH) program administered. R. 31-1 (Taylor Dep. at 39) (Page ID #526); R. 43-12 (Heapy Dep. at 12–13) (Page ID #1517). Freedom's Path preferred project-based vouchers to individual tenant-based housing vouchers because the former would help Freedom's Path overcome challenges that might face individual veteran renters. R. 31-1

(Taylor Dep. at 68–69) (Page ID #555–56). For example, homeless veterans with criminal records or histories of eviction may not be able to lease housing with individual-based housing vouchers. *Id*. Freedom's Path also preferred VASH vouchers to similar project-based vouchers available under Section 8 of the Housing Act of 1937 because VASH vouchers subsidized veterans-specific programs in ways that Section 8 vouchers did not. *Id*. at 24–25; 97–98 (Page ID #511–12, 584–8).

Freedom's Path also needed project-based vouchers to receive low-income tax credits from the OHFA. *Id*. at 33 (Page ID #520). Before issuing the tax credits to a developer, the OHFA required a public-housing authority to commit to a number of project-based vouchers equivalent to fifty percent of the proposed units. *Id.* Freedom's Path was proposing a sixty-six-unit project, so it needed GDPM to commit to thirty-three project-based vouchers to receive the tax credits. *Id.* at 39–40 (Page ID #526–27); R. 40-2 (Email exchange between Jennifer Heapy and Kim Powell at 1–2) (Page ID #913–14). Because only a public housing authority could, on behalf of itself or another entity, apply to HUD for project-based vouchers, GDPM's assistance was essential for Freedom's Path to pursue the development project. R. 43-14 (Taylor Decl. ¶ 19) (Page ID #1722).

In April 2013, GDPM's Interim Chief Executive Officer, Alphonzio Prude, committed in a letter to granting Freedom's Path thirty-three Section 8 project-based vouchers. R. 43-12 (Heapy Dep. at 87–89) (Page ID #1536); R. 6-1 (Letter from Alphonzio Prude to Don Paxton) (Page ID #62). After receiving this commitment and a $1 million grant from the Department of Veterans Affairs, Freedom's Path applied for low-income housing tax credits with OHFA. R. 31-1 (Taylor Dep. at 44–45, 54) (Page ID #531–32, 541). OHFA rejected Freedom's Path's application but encouraged it to reapply later. *Id.* at 44–45 (Page ID #531–32).

In his efforts to reapply to OHFA, Craig Taylor, the head of Freedom's Path, contacted GDPM. Because it would increase the chance that Freedom's Path would be awarded tax credits, Taylor asked GDPM to support his request for a letter of recommendation from the local county Housing Advisory Board. *Id.* at 99–100 (Page ID #586–87). Taylor also asked for a further commitment of VASH vouchers from GDPM. *Id.* at 96–97 (Page ID #583–84).

In general, GDPM could obtain VASH vouchers by applying for them when HUD issued a Notice of Funding Availability. R. 43-14 (Taylor Decl. ¶ 21) (Page ID #1723). GDPM could apply for the vouchers on its own behalf or on behalf of another entity. *Id.* ¶ 22–25 (Page ID #1723). To encourage the development of specific projects, HUD awarded more points to applications in which the public housing authority applies on behalf of an entity. *Id.* ¶ 24 (Page ID #1723). Taylor hoped that GDPM would apply for sixty VASH vouchers on behalf of Freedom's Path, thus increasing the likelihood that HUD would issue them. R. 31-1 (Taylor Dep. at 59–61) (Page ID #546–48). If GDPM were able to obtain the number of VASH vouchers he needed, Taylor planned to return the thirty-three Section 8 vouchers Prude previously committed to GDPM in exchange. *Id.*

Taylor initially reached out to GDPM in December 2015. In response to Taylor's inquiries, the new CEO of GDPM, Jennifer Heapy, explained to a colleague communicating with Taylor that GDPM could not honor Prude's previous commitment or apply for VASH vouchers on Freedom's Path's behalf due to a HUD regulation governing a public housing authority's selection of project-based voucher proposals. R. 40-2 (Email exchange between Jennifer Heapy and Kim Powell at 1–2) (Page ID #913–14). That regulation, 24 C.F.R. § 983.51(b), provides that a public housing authority can select project-based voucher proposals only through the procedures in the authority's

administrative plan.  The administrative plan must select such proposals through either (1) its own competitive process or (2) a previous selection based on a program requiring competition, if it took place within the past three years and did not involve any consideration that the project would receive project-based voucher assistance.  At the time, GDPM's Administrative Plan provided for project-based assistance via only the first method, i.e., "by a competitive request for proposals initiated by GDPM."  R. 42-21 (GDPM Administrative Plan at 1) (Page ID #1081).  According to Heapy, Prude's previous commitment did not reflect Freedom's Path's participation in the competitive process, so GDPM could not abide by Prude's commitment while adhering to federal regulations.  R. 40-3 (Email from Heapy to Taylor at 2) (Page ID #916).

In response to Heapy's concerns, Taylor proposed working with GDPM and HUD to amend GDPM's Administrative Plan so it could comport with the third-party competition exception that the regulations permitted.  R. 40-12 (Email exchange between Jennifer Heapy and Craig Taylor) (Page ID #959).  Taylor stated that he had faced similar obstacles in applying for vouchers for different projects in the past and offered to provide examples of language provided to other public housing authorities.  *Id.*

Extensive communications with Freedom's Path, GDPM, and their respective counsel, followed.  GDPM continued to assert that it would not honor Prude's April 2013 commitment because it had expired and was impermissible under federal regulations.  R. 40-3 (Email from Heapy to Taylor at 2) (Page ID #916); R. 40-4 (Email from Heapy to Taylor et al. at 1) (Page ID #918); R. 40-5 (Email from Heapy to Paxton at 2) (Page ID #921).  In response, Freedom's Path insisted that it had expended two years of effort in reliance on Prude's letter in pursuing the project.  R. 42-6 (Email Exchange between Freedom's Path and GDPM at 1) (Page ID #1012).  Freedom's

Path continued to ask GDPM to amend its Administrative Plan so that GDPM could comply with regulations and apply for vouchers on Freedom's Path's behalf. *Id.*

In February 2016, Freedom's Path reapplied for low-income tax credits to OHFA, submitting Prude's letter and a newly obtained letter of recommendation from the Housing Advisory Board in support of its application. *See* R. 31-1 (Taylor Dep. at 47, 118) (Page ID #534, 605); R. 30-1 (Paxton Dep. at 74–75) (Page ID #426–27). Later that year, OHFA granted Freedom's Path's application. R. 43-7 (Thomas Aff. at 1) (Page ID #1120). Freedom's Path suggested to GDPM that its success in OHFA's competitive process could allow GDPM to submit VASH vouchers on Freedom's Path's behalf under the HUD regulations. R. 42-9 (Email exchange between GDPM and Paxton at 2) (Page ID #1024). Freedom's Path asserted that GDPM needed only to modify its Administrative Plan. In response, GDPM insisted that it was close to its twenty-percent limit on project-based vouchers and reiterated that applying for the VASH vouchers would be impossible under the regulations. *Id.* at 1, 3 (Page ID #1023, 1025). Eventually, GDPM informed Freedom's Path that GDPM would be applying for thirty-five VASH vouchers on its own behalf. *Id.* at 10–11 (Page ID #1031–32). Freedom's Path continued to ask GDPM to apply for the sixty VASH vouchers on Freedom's Path's behalf. *Id.* at 10 (Page ID #1031).

On September 2, 2016, one week before HUD's deadline for requesting VASH vouchers, Freedom's Path emailed GDPM requesting a "reasonable accommodation" under the ADA and FHA. R. 40-10 (Letter from Freedom's Path's counsel to Heapy) (Page ID #952–53). Freedom's Path's counsel informed GDPM that GDPM must amend its Administrative Plan to allow for third-party competitive processes in order to provide Freedom's Path with a reasonable accommodation. *Id.* Freedom's Path reiterated its request for GDPM to apply for the sixty project-based VASH

vouchers, or at least provide twenty-five of the previously committed Section 8 vouchers in the alternative. *Id.* GDPM denied Freedom's Path's request as "unreasonable or contrary to federal regulations." R. 40-11 (Letter from GDPM's Counsel to Freedom's Path's counsel at 3) (Page ID #957).

GDPM applied to HUD for thirty-five VASH vouchers in its own name in September 2016. R. 43-12 (Heapy Dep. at 190–91) (Page ID #1562). None were awarded. *Id.* Approximately one month later, GDPM's Board of Housing Commissioners approved Freedom's Path's requested amendment to GDPM's Administrative Plan. *Id.* at 107–08. (Page ID #1541). GDPM had begun drafting the amendment in July 2016 but did not inform Freedom's Path. R. 52-1 (Heapy Suppl. Aff. ¶ 8) (Page ID #1953). By this point, however, the amendments were of no use to Freedom's Path because low-income tax credits had been canceled and its five-year lease from the VA had expired. R. 31-1 (Taylor Dep. at 184) (Page ID #671).

## B. Procedural History

In November 2016, Freedom's Path sued GDPM, alleging violations of the FHA as amended and Title II of the ADA. R. 1 (Compl. ¶ 54–72). In its Amended Complaint, Freedom's Path alleged that HUD would have awarded GDPM the VASH vouchers had GDPM complied with Freedom's Path's requests to amend GDPM's Administrative Plan and apply for vouchers on Freedom's Path's behalf. R. 6 (Am. Compl. ¶ 36–39). Its complaint alleged that GDPM intentionally discriminated against disabled persons, that GDPM's actions had the effect of discriminating against disabled persons, and that GDPM denied disabled persons a reasonable accommodation. *Id.*

7

GDPM moved for summary judgment, arguing that Freedom's Path did not demonstrate that it intentionally discriminated against disabled persons. R. 40 (Mot. for Summ. J. at 12–22); (Page ID #893–903). As for the reasonable accommodation claim, GDPM argued that it could not have granted Freedom's Path's accommodation because federal regulations "categorically precluded" GDPM from granting it. *Id.* at 11–15 (Page ID #892–96). According to GDPM, Freedom's Path's requested accommodation was unreasonable because it would have required GDPM to violate federal regulations, violate the procedures outlined in its Administrative Plan, and impose a fundamental alteration to its operations. *Id.* at 24 (Page ID #905). Freedom's Path opposed the motion, arguing that its "accommodation requests were reasonable because they would not have required [GDPM] to violate federal regulations or its own policies and procedures." R. 47 (Opp'n to Summ. J. at 3) (Page ID #1846).

Judge Rice in the U.S. District Court for the Southern District of Ohio granted summary judgment on Freedom's Path's intentional discrimination and disparate impact claims but denied summary judgment on the reasonable-accommodation claim.[1] R. 65 (3/25/2019 Dist. Ct. Order at 55) (Page ID #2159). Judge Rice first noted facts that were not in dispute: GDPM knew that many of Freedom's Path's tenants were disabled persons and that Freedom's Path requested an accommodation in asking GDPM to amend its Administrative Plan. *Id.* at 45–46 (Page ID #2149–50). Judge Rice also acknowledged that GDPM was categorically prohibited from applying for VASH vouchers under its Administrative Plan during the relevant period. *Id.* at 46–47 (Page ID #2150–51). He found, however, that genuine disputes of material fact existed regarding the

---

[1]Judge Rice also denied Freedom's Path's motion for partial summary judgment, but that finding is not at issue in this appeal. R. 65 (3/25/2019 Dist. Ct. Order at 52) (Page ID #2156).

reasonableness of Freedom's Path's request to amend GDPM's Administrative Plan. *Id.* at 50 (Page ID #2154). According to Judge Rice, a reasonable juror could determine that Taylor's December 2015 email correspondence and related conversations with GDPM could be construed as a request for a reasonable accommodation. *Id.* A juror could also determine, according to Judge Rice, that GDPM could have reasonably amended its Administrative Plan "well before the September 9, 2016 deadline for submitting applications for VASH vouchers" had it started the process in December 2015. *Id.*

Five months later, GDPM moved for reconsideration of Judge Rice's opinion. R. 69 (Mot. for Recons. at 1) (Page ID #2165). GDPM argued that Freedom's Path's reasonable-accommodation claim must fail because there was no nexus between the requested accommodation and the disability. *Id.* at 5–7 (Page ID #2169–71). In other words, GDPM argued that because it would have rejected Freedom's Path's proposal even if its tenants were not disabled, Freedom's Path's request could not be construed as a request to accommodate a disability. *Id.* at 7 (Page ID #2171).

Judge Rice declined to reconsider his previous order. R. 73 (11/13/19 Dist. Ct. Order at 2) (Page ID #2216). Noting that GDPM failed to raise this "nexus" argument in its summary-judgment briefing, he declined to consider it on reconsideration. *Id.* at 4–6 (Page ID #2218–20). He did not address the merits of the argument.[2] *Id.*

---

[2]Judge Rice also rejected GDPM's arguments that Freedom's Path did not offer any evidence that its prospective tenants would be disabled and that no reasonable juror could believe that Taylor's email was a request for a reasonable accommodation. R. 73 (11/13/19 Dist. Ct. Order at 4–5, 6–8) (Page ID #2218–19, 2220–22). Judge Rice found that GDPM had waived the first argument, and that even if the issue were not waived, GDPM "knew that the housing units were intended for veterans, many of whom were qualified persons with disabilities." *Id.* at 5 (Page ID #2219). As for the second argument, Judge Rice declined to reconsider his previous finding that a reasonable juror could construe Taylor's December 2015 communications with GDPM as a request for a reasonable accommodation. *Id.* at 6–8 (Page ID #2220–22).

In February 2020, Judge Rice recused himself from the case. R. 102 (Recusal Order) (Page ID #2818). The case was reassigned to Judge Rose, who began to preside over pre-trial proceedings. *Id.* In January 2021, nearly a year after Judge Rice's recusal and almost two years after Judge Rice's denial of summary judgment to GDPM on the reasonable-accommodation claim, Judge Rose issued a sua sponte order granting summary judgment to GDPM and dismissing the case. R. 109 (1/5/2021 Dist. Ct. Order at 1–2) (Page ID #2871–72). Observing that an element of an FHA or ADA reasonable-accommodation claim is denial of "equal opportunity" to enjoy the housing of one's choice, Judge Rose found that Freedom's Path did not demonstrate the requisite nexus between the necessity of its proposed accommodation and such an equal opportunity. *Id.* at 17 (Page ID #2886). Because Freedom's Path did not show that "but for the accommodation, [it] would likely be denied an equal opportunity to enjoy the housing of [its] choice," there was no "genuine issue of material fact to dispute that GDPM provided [Freedom's Path] with equal opportunity." *Id.* at 17–18 (Page ID #2886–87). Freedom's Path appeals the district court's grant of summary judgment to GDPM.

## II. ANALYSIS

### A. Judge Rose's Decision to Reconsider

Freedom's Path first urges us to review Judge Rose's sua sponte reconsideration of Judge Rice's decision. We review for abuse of discretion a successor judge's decision to reconsider a previous judge's denial of summary judgment. *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 722 (6th Cir. 2019). The law-of-the-case doctrine discourages district court judges from "hastily disturb[ing]" the rulings of a previous judge in the same case. *Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 590 (6th Cir. 1995). For this reason, lower

courts generally grant reconsideration only when "there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). The law of the case, however, is "not a limit to [a court's] power." *Elizabeth Place*, 922 F.3d at 734 (Sutton, J., concurring) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). Under Federal Rule of Civil Procedure 54(b), a district court may revise a previous order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." And although "we discourage granting summary judgment *sua sponte* on grounds not urged by either party, . . . we do not prohibit the practice per se." *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 959 (6th Cir. 2007).

A judge's discretion, however, is not unfettered. Judge Rose tested the limits of his discretion in several ways. First, he relied on an issue, the necessity of the proposed accommodation, that was raised for the first time in a motion to reconsider before Judge Rice. R. 73 (11/13/19 Dist. Ct. Order at 5–6) (Page ID #2219–20). GDPM did not explain why it waited until after summary-judgment briefing concluded to raise the argument. Judge Rose, moreover, did not explain why Judge Rice clearly erred in declining to consider this argument for the first time on reconsideration. *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007) ("[P]arties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued."). Second, Judge Rose waited almost a year after inheriting the case from Judge Rice and almost two years after Judge Rice's summary-judgment decision to dismiss the case sua sponte. Especially when issued so long after summary

judgment is denied, such unexpected decisions harm the reliance interests of parties that were not expecting to relitigate matters.

Judge Rose's choices are troubling, but it is unclear if they constitute an abuse of discretion given district courts' broad authority to revisit interlocutory orders such as denials of summary judgment. *ACLU of Kentucky v. McCreary County*, 607 F.3d 439, 450 (6th Cir. 2010) (noting that district courts may reconsider summary judgment decisions "for any reason" (quoting *Cameron v. Ohio*, 344 F. App'x 115, 118 (6th Cir. 2009)); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 118 F. App'x 942, 945 (6th Cir. 2004) (noting that district court may reconsider interlocutory orders "at any time"). Ultimately, we decline to decide the issue because we hold on the merits that Judge Rose erred in granting GDPM summary judgment.

## B. Judge Rose's Grant of Summary Judgment

We review de novo a successor judge's grant of summary judgment when the judge's application of the law is at issue. *Elizabeth Place*, 922 F.3d at 723. "Summary judgment is warranted if, viewing the facts in the light most favorable to the nonmoving party, no material fact is subject to a genuine dispute." *Id.* at 722 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986)).

Under the FHA, discrimination includes the "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). A public entity has an "affirmative duty" reasonably to accommodate disabled persons under the FHA. *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002). Regulations implementing Title II of the ADA contain a similar prohibition on denying persons with disabilities

reasonable accommodations: "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). The parties agree that "[t]he requirements for reasonable accommodation under the ADA are the same as those under the FHAA." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002).

To prevail on a failure-to-accommodate claim, "a plaintiff must prove that (1) she suffers from a disability . . . ; (2) the defendant knew or reasonably should have known of the disability; (3) the requested accommodation may be necessary to afford an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable, and (5) the defendant refused to make the accommodation." *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2011) (quotation omitted). GDPM addressed only the reasonableness of the accommodation in its initial summary-judgment briefing, and Judge Rice found a genuine dispute of material fact on that issue. In his subsequent sua sponte dismissal order, Judge Rose granted GDPM summary judgment because he found that Freedom's Path insufficiently established the third factor, that the change to the Administrative Plan was necessary to afford proposed disabled tenants equal opportunity. R. 109 (1/5/2021 Dist. Ct. Order at 17) (Page ID #2886). On appeal, the parties address only Judge Rose's basis for granting summary judgment. Accordingly, we limit our discussion to the necessity of Freedom's Path's proposed accommodation.

We previously considered the relationship between the terms "equal opportunity" and "necessary" in *Smith & Lee Associates, Inc. v. City of Taylor*, 102 F.3d 781, 794 (6th Cir. 1996). We first noted that the House Report on the Fair Housing Amendments Act offered relevant context as to the meaning of "equal opportunity":

13

> The Fair Housing Amendments Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment *to end the unnecessary exclusion of persons with handicaps from the American mainstream.*

*Id.* (quoting H.R. Rep. No. 100-711, at 18 (1988)). We further found "persuasive the analysis of courts that define equal opportunity . . . as giving handicapped individuals the right to choose to live in single-family neighborhoods." *Id.* Linking the term "'necessary' to the goal of equal opportunity," we held that "[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Id.* at 795.

We applied these principles to the facts of *Smith & Lee*, in which an adult foster home specializing in the care of elderly disabled persons requested that the City of Taylor allow it to house additional residents. *Id.* at 785–86. The city refused, explaining that expanding the allowed number of residents in the building would be inconsistent with the established single-family residential character of the neighborhood. *Id.* at 785. We held that in doing so, the city failed reasonably to accommodate Taylor's elderly disabled. *Id.* at 795. In holding that "Taylor's elderly disabled need an accommodation," we observed that adult foster-care homes "often provide the only means by which this population can continue to live in residential neighborhoods," and "are in insufficient supply." *Id*. at 795–96.

Applying *Smith & Lee*'s necessity rule here, we must ask whether both disabled tenants and non-disabled tenants would have an equal opportunity to "enjoy the housing of their choice" but for GDPM's failure to amend its Administrative Plan. *Id.* at 795. The parties do not challenge this test but frame its application in different ways. GDPM argues that its refusal to amend its plan equally deprived disabled and non-disabled persons of the opportunity *to live in the proposed development* because, as the district court held, Freedom's Path "would not succeed" in obtaining

the vouchers "just as non-disabled people would not succeed." Appellee's Br. at 20–21. Freedom's Path asks us to adopt a broader understanding of equal opportunity. It argues that GDPM's failure to apply for VASH vouchers deprived its disabled tenants of the opportunity *to live in the Dayton community* equal to that of nondisabled persons in the community. Appellant's Br. at 41–42.

Freedom's Path's framework better aligns with *Smith & Lee* and the purpose of the Fair Housing Act Amendments. In *Smith & Lee*, we emphasized that the Fair Housing Act Amendments aimed "to *end the unnecessary exclusion of persons with handicaps from the American mainstream.*" 102 F.3d at 794 (quoting H.R. Rep. No. 100-711, at 18 (1988)). Because the city's denial of the adult foster home's rezoning permit deprived the elderly disabled of places to live in an area where suitable dwellings were in short supply, we held that the accommodation was necessary. *Id.* at 795–96. It was thus irrelevant that the city may have denied a rezoning permit to increase the occupancy limit in the building, even if the occupants of the foster home had not been disabled. Here too, we must ask whether GDPM's successful procurement of VASH vouchers—which would allow Freedom's Path to create housing for disabled veterans—would accommodate disabled veterans by providing them access to housing more readily available to nondisabled persons. Specifically, we must ask whether a reasonable factfinder could determine that the accommodation is necessary to afford disabled persons an equal opportunity. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 362 (6th Cir. 2015) (denying defendant summary judgment because reasonable jury could find that plaintiff's requested accommodation was necessary).

A reasonable jury could find that but for GDPM's denial of Freedom's Path's proposed accommodation, disabled veterans would have an opportunity to live in the Dayton community more equal to the opportunity of nondisabled persons. In its opposition to summary judgment, Freedom's Path emphasized that "[t]here is a need for, and a short supply of, affordable housing for homeless and disabled veterans on the VA Medical Center . . . campus in Dayton and in the surrounding housing markets." R. 47 (Opp'n to Summ. J. at 4) (Page ID #1847). Taylor testified to the community's "extensive need for homeless veterans housing," relying upon data from HUD's Annual Housing Assessment Report, the U.S. Department of Veterans Affairs, and Freedom's Path's own market data. R. 31-1 (Taylor Dep. at 178–79) (Page ID #666). In addition, the very nature of the proposed development and the VASH program aspired to provide supportive services to those with disabilities to enable them to live in the community. *See* U.S. Dep't of Veterans Affs., *HUD-VASH Eligibility Criteria* (Feb. 19, 2019), https://www.va.gov/homeless/hud-vash_eligibility.asp ("Veterans who are appropriate candidates for [the VASH] program demonstrate the most need or vulnerability and must need case management services in order to obtain and sustain independent community housing."). As Judge Rice noted, "the requested accommodation was necessary to afford disabled veterans the opportunity to live on the Veteran's Administration's Medical Campus with easy access to support services." R. 65 (3/25/2019 Dist. Ct. Order at 46) (Page ID #2150). A reasonable juror could thus conclude that allowing the Freedom's Path development was a necessary accommodation allowing for disabled veterans to live in the Dayton community.

Stating that the proposed accommodation had "nothing to do with the alleged disabled status of any prospective tenants of the Freedom's Path project," GDPM argues that there is no

"causal link" between Freedom's Path's requested accommodation and the disability of its proposed tenants. Appellee's Br. at 19, 20. A reasonable accommodation is necessary, GDPM argues, "only when it allows the disabled to obtain benefits that they ordinarily could not have by reason of their disabilities, and not because of some quality that they share with the public generally." *Id.* at 19 (quoting *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 754 (7th Cir. 2006) (en banc)). But a reasonable juror could find that the effect of a disability renders housing unavailable for disabled veterans. *Oconomowoc*, 300 F.3d at 784 ("Often, a community-based residential facility provides the only means by which disabled persons can live in a residential neighborhood, either because they need more supportive services, for financial reasons, or both."). In other words, as Freedom's Path argues, a reasonable juror could find that "the disability of the homeless veterans is the cause in fact of their inability to obtain housing." Appellant's Reply Br. at 15. The proposed accommodation, GDPM's amending its Administrative Plan to enable it to seek VASH vouchers, would allow Freedom's Plan to provide such housing, and thus redress the effects of the disability.

GDPM cites several cases from outside the circuit to support its argument, but they do not compel a holding that Freedom's Path's proposed accommodation was unnecessary. In *Good Shepherd Manor Foundation, Inc. v. City of Momence*, the city shut off the water supply to a property housing disabled adult residents. 323 F.3d 557, 560 (7th Cir. 2003). The court held that by shutting off the water, the city hurt the disabled residents "solely by virtue of what they have in common with other people, the need of water." *Id.* at 561 (quoting district court opinion). Here, GDPM's failure to amend its Administrative Plan hurt disabled residents by denying them

17

supportive housing in the Dayton community, a need that a juror could find non-disabled persons do not share.

*Wisconsin Community Services* does not help GDPM either. In that case, a mental-health clinic requested a special-use permit from the City of Milwaukee that would allow it to move to a new neighborhood to avoid overcrowding. 465 F.3d at 741. The city denied the permit, stating that the mental-health clinic would undermine the commercial aspirations of the neighborhood. *Id.* at 742. After the district court granted partial summary judgment to the clinic, the Seventh Circuit remanded the case to the district court to "afford the parties the opportunity to develop the question of whether [the clinic] has been prevented, because of its clients' disabilities, from locating a satisfactory new facility." *Id.* at 755. The Seventh Circuit faulted the district court for "assuming that the proposed modification could be deemed 'necessary' even if the disabilities suffered by [the clinic's] patients were not the cause-in-fact of its inability to find a larger building." *Id.* By contrast, here we ask whether GDPM's failure to amend its Administrative Plan would prevent disabled veterans from "enjoy[ing] the housing of their choice." *Smith & Lee*, 102 F.3d at 795. And unlike in *Wisconsin Community Services*, in which the court was reviewing a grant of summary judgment for plaintiffs, we merely ask whether a reasonable jury could determine that "the requested accommodation may be necessary to afford an equal opportunity to use and enjoy the dwelling[s]." *Overlook Mut. Homes*, 415 F. App'x at 621 (quotation omitted). Because a jury could find that Freedom's Path's requested accommodation may be necessary, summary judgment for GDPM was improper.

It follows that Freedom's Plan's proposed accommodation would not afford disabled persons "an additional or better opportunity to obtain the desired project-based vouchers," a result

GDPM argues the law does not compel. Appellee's Br. at 27, 33; *see also Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012). This case differs from *Cinnamon Hills*, in which Saint George City denied a residential-treatment facility's request to convert the top floor of a motel into a reentry program for young persons. 685 F.3d at 919. In that case, zoning requirements prevented anyone, "disabled or otherwise" from staying in a motel or residing in the commercial zone, so the residential facility was "seeking an opportunity that isn't available to others rather than one that is." *Id.* at 923–24. But as we have explained, here Freedom's Path is seeking an accommodation (i.e., an amendment to the Administrative Plan) that would provide an opportunity for disabled veterans—the ability to live in the Dayton community—that is generally available to non-disabled persons.

As then-Judge Gorsuch noted, "under the FHA it is sometimes necessary to dispense with formal equality of treatment in order to advance a more substantial equality of opportunity." *Id.* at 923. Viewing the facts and drawing all inferences in the light most favorable to Freedom's Path, a jury could conclude that it was necessary for GDPM to amend its Administrative Plan to advance such equality of opportunity for disabled veterans. A reasonable jury could find that amending the plan would have afforded disabled veterans an opportunity to live near the VA campus and placed them on equal footing with non-disabled persons living in the Dayton community. Accordingly, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings.