NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0482n.06

Case No. 22-3935

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>DAYTON VETERANS RESIDENCES LIMITED PARTNERSHIP, dba Freedom's Path at Dayton,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>DAYTON METROPOLITAN HOUSING AUTHORITY, dba Greater Dayton Premier Management,<br><br>    Defendant-Appellee.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td><strong>FILED</strong><br>Nov 21, 2023<br>KELLY L. STEPHENS, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO<br><br><br>O P I N I O N</td></tr>
</table>

BEFORE: McKEAGUE, READLER, and DAVIS, Circuit Judges.

**McKEAGUE, Circuit Judge.** For over five years, Dayton Veterans Residences Limited Partnership (doing business as Freedom's Path) tried to develop affordable housing for homeless veterans in Dayton, Ohio. It made some progress. Freedom's Path received a lease, tax credits, and, initially, the support of Dayton Metro Housing Authority (doing business as Greater Dayton Premier Management). But Greater Dayton Premier Management—GDPM for short—later withdrew its support, claiming that federal regulations prohibited it from requesting rental subsidies for Freedom's Path. Though GDPM could have avoided that obstacle by amending its administrative plan, it did so too late. Without rental subsidies, Freedom's Path's project failed.

Freedom's Path turned to the courts for relief, alleging that GDPM violated the Americans with Disabilities Act and Fair Housing Act. The district court granted GDPM summary judgment,

but we reversed, holding that a reasonable jury could find that Freedom's Path sought a necessary accommodation. On remand, a jury found in GDPM's favor. Freedom's Path appeals, arguing that the district court presented flawed jury instructions and erred in several evidentiary rulings. We **AFFIRM**.

## I.    BACKGROUND

We have seen this case once before. In our prior opinion, which we will refer to as *Dayton I*, this Court described in detail the factual and procedural background of the case. *See Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 21-3090, 2021 WL 5411220, at *1–5 (6th Cir. Nov. 19, 2021). We now recount the facts pertinent to the issues raised in this appeal and those that have transpired since our first ruling.

### A.    *Dayton I*

In its amended complaint, Freedom's Path alleged three claims under the ADA and FHA: intentional discrimination, disparate impact, and failure to accommodate. In support of its claims, Freedom's Path asserted that GDPM prevented it from receiving rental subsidies needed for its development. Discovery closed on May 1, 2018, and both parties subsequently moved for summary judgment. The judge initially assigned to the case denied Freedom's Path's motion in full. GDPM's motion fared slightly better. It was granted as to Freedom's Path's first two claims but denied regarding the latter. GDPM moved for reconsideration, to no avail. The district court set trial on Freedom's Path's reasonable-accommodation claim for January 27, 2020.

That trial date, like several other case dynamics, soon changed. First, on January 6, 2020, Christopher Green withdrew as GDPM's counsel. GDPM identified Green as a trial witness six days later. Second, the initial judge recused himself. The court assigned a second judge, who scheduled trial for March 22, 2021.

2

But that date did not stick either. Almost a year after being assigned to the case, the second judge sua sponte reconsidered GDPM's motion for summary judgment and granted it in full. As he saw it, Freedom's Path had "not shown that, but for the accommodation, [it] would likely be denied an equal opportunity to enjoy the housing of [its] choice." Second Summ. J. Order, R.109, PageID 2886. The case was dismissed.

Freedom's Path appealed, and this Court reversed, *Dayton I*, 2021 WL 5411220. We framed the relevant question: Could a reasonable factfinder "determine that the accommodation is necessary to afford disabled persons an equal opportunity"? *Id.* at *7 (citing *Anderson v. City of Blue Ash*, 798 F.3d 338, 362 (6th Cir. 2015)). Viewing the evidence in the light most favorable to Freedom's Path, we answered, "Yes." Freedom's Path demonstrated a need for homeless and disabled veterans' housing in Dayton, Ohio. *Id.* at *8. Further, its proposed development aspired to enable those individuals to live in the community. *Id.* Accordingly, a reasonable jury could conclude "it was necessary for GDPM to amend its Administrative Plan to advance [a more substantial] equality of opportunity for disabled veterans," as conceptualized by then-Judge Gorsuch in *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012). *Id.* at *9. We remanded for further proceedings.

## B. Trial Proceedings

### 1. Pre-Trial Rulings

In preparing for trial, the district court issued several rulings. Three are relevant here.

First, the court addressed Freedom's Path's motion to exclude evidence. Freedom's Path argued that the district court should exclude Christopher Green as a witness. It also asked the court to exclude any evidence that (1) GDPM relied on the advice of counsel or the Department of Housing and Urban Development (HUD), and (2) Freedom's Path lacked prospective disabled

tenants. The district court was unpersuaded. Nevertheless, it limited the scope of Green's testimony "because [he] was not disclosed as an expert witness." Order on Pl.'s First Mot. Lim., R.137, PageID 3330. Specifically, the district court precluded Green from testifying as to "the reasonableness of Jennifer Heapy's reasoning concerning the denial of [Freedom's Path's] proposed accommodation." *Id.* at PageID 3330–31.

The district court also addressed GDPM's motion to limit Freedom's Path's presentation of damages and request to submit an affidavit from HUD employee Gordon Black. Freedom's Path sought to introduce evidence of over $21 million in economic damages. And Black's affidavit swore that the attached exhibit was a "true and accurate copy" of his email to Jennifer Heapy on January 6, 2016. Mot. Submit Aff., R.138, PageID 3336. The district court granted both motions. But Freedom's Path could still present evidence concerning its lost developer's fee.

### 2.  Trial

On June 3, 2022, the district court entered a final pretrial order, which, among other things, outlined GDPM's defenses and the uncontroverted facts. Ten days later, the jury trial began. It was limited to Freedom's Path's reasonable-accommodation claim.

#### a.  Witnesses

The parties presented five witnesses over six days. Three testified for Freedom's Path. The first was Craig Taylor, who oversaw the development project. Then came Ohio Housing Finance Agency employee Sean Thomas. During the relevant timeframe, Thomas served as the agency's executive director. Don Paxton testified last. He worked alongside Taylor on the Freedom's Path project. In defense, GDPM presented Jennifer Heapy and Christopher Green. Heapy, a lawyer, is GDPM's CEO. Green was its general counsel during the relevant period and

previously its counsel of record in the case. As general counsel, Green dealt with all accommodation requests.

### b. Testimony

Together, those five witnesses offered the following relevant testimony.

In 2011, Paxton and Taylor co-founded Communities for Veterans. Their mission? To develop veteran housing using HUD's Veterans Affairs Supportive Housing program, colloquially referred to as HUD-VASH. Under that program, which supports homeless veterans, HUD provides rental subsidies, and the VA provides an onsite agent to serve the veteran residents.

Communities for Veterans wanted to build veteran housing in several locations, including sixty units in Dayton, Ohio. To that end, Paxton and Taylor formed Freedom's Path. The project development process required Freedom's Path to secure (1) a site on a VA campus, (2) funding through tax credits, and (3) project-based vouchers for rental subsidies. Only public housing authorities, like GDPM, can apply for the latter.

Freedom's Path initially had no trouble securing a site and vouchers. In 2011, following a competitive application process, the VA awarded it a five-year, enhanced-use lease for land at the Dayton VA Medical Center. Around two years later, GDPM's then-executive director, Alphonzio Prude, committed thirty-three Section 8 vouchers to Freedom's Path.

Tax credits were a different story. Freedom's Path had to apply for low-income housing tax credits through the Ohio Housing Finance Agency. Those credits are available to projects serving low-to-mid-level income residents, regardless of disability status. Though Freedom's Path had a fifty-percent voucher commitment—one of the requirements to apply—its first application failed.

Undeterred, Freedom's Path sought to revamp its application. It collected more robust public-official support letters and community service program commitments. It also tried to collect a letter of support from the local housing advisory board, which its application had lacked. But before the board would provide its recommendation, it requested proof of a voucher commitment. By then, Prude's commitment was two and a half years old. So, in December 2015, Taylor re-approached GDPM. Trouble ensued.

Taylor first communicated with Heapy on December 15, 2015. Over a phone call, he asked for an updated (and additional) commitment of HUD-VASH vouchers, and a letter supporting Freedom's Path's request for a recommendation. Freedom's Path needed GDPM's commitment by December 18.

Heapy did not oblige. She believed Prude's prior commitment violated federal regulations, namely 24 C.F.R. § 983.51(b). That regulation requires public housing authorities to issue project-based vouchers "in accordance with . . . [their] administrative plan." At the relevant time, GDPM's plan only authorized it to issue vouchers following a competitive process initiated by GDPM. Prude had not followed that procedure.

Taylor did not think the regulations were a complete barrier. As he saw things, they allowed GDPM to issue vouchers after its own *or* another program's competitive process. And Taylor believed Freedom's Path satisfied the latter option because the VA had awarded it a lease. But Heapy did not know that the lease was competitively awarded. Later that day, Taylor emailed Heapy, reiterating his thoughts. He also offered to provide examples of language used in other housing authorities' administrative plans. In Taylor's view, the above communications amounted to a request on behalf of disabled persons for GDPM to amend its plan.

Heapy interpreted Taylor's acts differently. She thought he had suggested that the regulations permitted GDPM, without amending its administrative plan, to make a voucher commitment. Heapy reached out to GDPM's general counsel, Christopher Green, and later her contact at HUD, Gordon Black, to confirm if her understanding of the regulations was correct. She never asked Green or Black whether GDPM could amend its administrative plan. Both said that the regulations prohibited GDPM from making a commitment.

On December 18, 2015, Heapy again broke the news to Taylor—GDPM would not issue a new commitment. She re-explained that federal regulations did not allow GDPM to do so without holding a competitive bidding process. Paxton tried to intervene, but GDPM maintained its position.

Notwithstanding its lack of a *new* commitment letter, Freedom's Path re-applied for low-income housing tax credits in February 2016. This time it had better luck; the Ohio Housing Finance Agency granted its application. Now, all Freedom's Path needed was for GDPM to apply for HUD-VASH vouchers on its behalf.

GDPM did not budge. In September 2016, it informed Freedom's Path that GDPM would apply for thirty-five vouchers in its own name. And if vouchers were awarded, Freedom's Path would need to compete for them. However, GDPM ultimately received no vouchers. Had it applied on Freedom's Path's behalf, things may have turned out differently. After all, additional weight is provided to projects involving an enhanced-use lease, like Freedom's Path's development.

That same month, Freedom's Path's attorney sent GDPM a letter formally requesting a disability accommodation. Before then, Freedom's Path's written communications had referred to its prospective tenants as "veterans" and "homeless." None used the word "disabled." Taylor

contended that such an omission, however, was not without reason. In his experience, every homeless veteran had at least one disability. Paxton expressed a similar sentiment. He believed that references to HUD-VASH or veterans indicated that Freedom's Path was "dealing with [the] disabled." Trial Tr., R.172, PageID 4164 (Paxton testimony). GDPM's witnesses disagreed.

In the end, GDPM revised its administrative plan. But the amendment came too late for Freedom's Path. By the time it was approved by HUD in April 2017, Freedom's Path's lease had expired.

### 3. The Jury

Following the presentation of that evidence, the district court charged the jury. It took judicial notice of several exhibits, including one outlining the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009. As for the rest of the instructions, the parties submitted proposals and objections. The court gave two instructions despite Freedom's Path's objections. First, the district court explained that, to prevail, Freedom's Path had to establish that "the requested accommodation was necessary to enable disabled individuals to use and enjoy a dwelling." Trial Tr., R.175, PageID 4602. Later, the court also instructed: "An accommodation that benefits both disabled and non-disabled individuals equally is not necessary as an accommodation of a disability." *Id.* at PageID 4606–07.

> Missing from the charge was Freedom's Path's proposed instruction:
>
> HUD-VASH prioritizes the chronically homeless, who are defined as being an adult head of household with a diagnosable substance use disorder, serious mental illness, developmental disability (as defined in section 102 of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15002)), post traumatic stress disorder, cognitive impairments resulting from a brain injury, or chronic physical illness or disability, including the co-occurrence of two or more of those conditions.

8

Pl.'s Proposed Jury Instrs., R.141, PageID 3385. In the district court's view, that instruction supported an argument that was at best misleading and at worst false.

Deliberations lasted roughly an hour. Ultimately, the jury determined that Freedom's Path had not proven its claim.

## C.     Post-Trial

A week later, the district court entered a final judgment in GDPM's favor. Freedom's Path moved for a new trial. It argued that the district court erred as to three jury instructions, in four of its evidentiary rulings, and in limiting Freedom's Path's presentation of damages. The district court denied that motion, reasoning that none of those alleged errors supported an award of a new trial. Freedom's Path, again, timely appealed. We held oral argument on October 25, 2023.

## II.     ANALYSIS

On appeal, Freedom's Path targets the same alleged errors it raised in its motion for a new trial. We address them in turn.

## A.     Jury Instructions

Freedom's Path attacks the district court's jury instructions on two fronts. First, it argues that they conflict with our mandate in *Dayton I*. Second, Freedom's Path asserts that the instructions are generally inconsistent with Sixth Circuit precedent.

The mandate rule, invoked in Freedom's Path's first argument, is an extension of the law-of-the-case doctrine. *Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir. 1992). It requires district courts to adhere to the opinion directing remand. *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994). District courts must "implement both the letter and the spirit of the mandate." *Id.* (quoting *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir. 1991)). Put simply, our prior determinations of issues of law are binding on the district court and this Court on subsequent appeal. *See United*

*States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999). We interpret our mandate de novo. *United States v. Moore*, 131 F.3d 595, 598 (6th Cir. 1997).

The legal accuracy of jury instructions is also reviewed de novo. *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010). But other challenges to jury instructions, including arguments that the district court failed to provide a specific instruction, are generally reviewed for an abuse of discretion. *Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 365–66 (6th Cir. 2005); *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008). After all, the district court "enjoys considerable latitude in selecting appropriate language." *Bucyrus-Erie Co. v. Gen. Prods. Corp.*, 643 F.2d 413, 418 (6th Cir. 1981). For reversal, that standard requires a "definite and firm conviction that the trial court committed a clear error of judgment." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).

To assess whether the district court abused its discretion in issuing jury instructions, we consider whether the charge, viewed as a whole, "fairly and adequately submits the issues and applicable law to the jury." *United States v. Pensyl*, 387 F.3d 456, 458 (6th Cir. 2004) (quoting *United States v. Zidell*, 323 F.3d 412, 427 (6th Cir. 2003)). Reversal is only appropriate when the instructions "were confusing, misleading, or prejudicial." *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999) (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 73 (6th Cir. 1990)).

### 1. "Was Necessary"

Freedom's Path's first challenge to the district court's jury instructions concerns the "necessity" element for reasonable-accommodation claims. It argues that the charge overstated how necessary an accommodation must be to providing disabled veterans an equal opportunity to

access housing. The district court instructed the jury that Freedom's Path must prove that the requested accommodation "was necessary" to enable disabled persons to access housing. Trial Tr., R.175, PageID 4602. GDPM agrees with that formulation, arguing that this Court repeatedly used that standard in *Dayton I* and elsewhere. Further, GDPM observes that Freedom's Path, in its proposed instructions, cited a case employing the "was necessary" standard. Meanwhile, Freedom's Path contends that *Dayton I* and Sixth Circuit precedent specify that it need only show that the accommodation "may be necessary." Having reviewed our mandate and the law of the Circuit, we find Freedom's Path's argument unpersuasive.

Begin with *Dayton I*. In that order, this Court reviewed the necessity of Freedom's Path's proposed accommodation. *Dayton I*, 2021 WL 5411220, at *6. And instead of disclaiming the district court's "was necessary" formulation, the Court frequently adopted it in its analysis. For one example, consider how we framed the relevant legal question. We asked "whether a reasonable factfinder could determine that the accommodation *is* necessary." *Id.* at *7 (emphasis added). For another, look to the opinion's concluding summary. It states that "a jury could conclude that it *was* necessary for GDPM to amend its Administrative Plan." *Id.* at *9 (emphasis added). Other examples of the opinion employing the "was necessary" formulation also exist. *E.g.*, *id.* at *1, *7, *8. Accordingly, in instructing the jury to assess whether the accommodation *was* necessary, the district court did not defy *Dayton I*. In fact, it followed *Dayton I*'s lead.

Now consider some of the cases cited in *Dayton I*. They generally represent this Circuit's approach to the issue. And they too often employ the "was necessary" formulation. In *Smith & Lee Associates, Inc. v. City of Taylor*, for example, the Court indicated that plaintiffs must demonstrate that the accommodation "is necessary." 102 F.3d 781, 796 n.11 (6th Cir. 1996) (citing *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)). Elsewhere in *Smith & Lee*, the Court

11

explained that the district court, on a prior remand, had to consider whether a requested accommodation "was necessary." 102 F.3d at 795. *Howard v. City of Beavercreek* is of accord. In that case, we held that the district court properly granted summary judgment because the plaintiff failed to prove that "the variance he requested *was* a necessary accommodation." *Howard*, 276 F.3d 802, 807 (6th Cir. 2002) (emphasis added); *see also id.* at 806. Under this precedent, the district court did not err.

Arguing otherwise, Freedom's Path cites (1) the FHA and (2) other text in *Dayton I* and the cases *Dayton I* references. The FHA defines "discrimination" to include the "refusal to make reasonable accommodations . . . when such accommodations *may be* necessary." 42 U.S.C. § 3604(f)(3)(B) (emphasis added). Further, in listing the elements of a reasonable-accommodation claim, *Dayton I* stated that a plaintiff must prove "the requested accommodation may be necessary." *Dayton I*, 2021 WL 5411220, at *6; *see also id.* at *8 ("[W]e merely ask whether a reasonable jury could determine that 'the requested accommodation may be necessary to afford an equal opportunity to use and enjoy the dwelling[s].'" (second alteration in original) (quoting *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2011))). *Howard*, *Smith & Lee*, and *Anderson v. City of Blue Ash*—all cited in *Dayton I*—also use "may be necessary" at least once. *Howard*, 276 F.3d at 805–06; *Smith & Lee*, 102 F.3d at 790; *Anderson*, 798 F.3d at 360.

None of these arguments change our conclusion. First, though the FHA uses "may be necessary," regulations implementing the ADA—also applicable here—employ a "was necessary" formulation. *See* 28 C.F.R. § 35.130(b)(7)(i) (requiring reasonable modifications when they "are necessary" to avoid discrimination). Second, this Court's use of the "may be necessary" formulation is generally limited to outlining the FHA's language. On the few occasions *Dayton I*

12

arguably used it for anything more, the Court cited the unpublished and therefore non-precedential opinion in *Overlook Mutual Homes, Inc. v. Spencer*, 415 F. App'x 617 (6th Cir. 2011). *E.g.*, *Dayton I*, 2021 WL 5411220, at \*6, \*8. But inherent in the application of the FHA's definition is the issue of whether the accommodation at issue "was" or "is" necessary. *See Anderson*, 798 F.3d at 361–62. And for good reason. At bottom, the necessity element is a causation inquiry that asks whether the accommodation "would"—not might—redress injuries inhibiting disabled residents' enjoyment of their property. *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014); *see also Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 107 (3d Cir. 2018) (concluding that the use of "may" does not "water[] down the degree of necessity" required). Accordingly, Freedom's Path needed to show that, but for the accommodation it sought, disabled veterans would likely have been denied an equal opportunity to access housing. *See Anderson*, 798 F.3d at 361 (citing *Smith & Lee*, 102 F.3d at 795). The district court accurately apprised the jury of these legal principles in using the "was necessary" formulation.

### 2. "Benefits Both . . . Equally"

Next, Freedom's Path contends that the jury instructions overstate when a requested accommodation is unnecessary. On this point, the district court instructed: "An accommodation that benefits both disabled and non-disabled individuals equally is not necessary as an accommodation of a disability." Trial Tr., R.175, PageID 4606–07. Freedom's Path asserts that the court misstated the law, confused the issue, and undermined *Dayton I*'s reference to *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917 (10th Cir. 2012) (Gorsuch, J.). GDPM disagrees, asserting that the instructions, considered as a whole, were consistent with our mandate and case law. We agree with GDPM.

As before, we start by interpreting de novo *Dayton I*. There, the Court quoted *Cinnamon Hills* for the proposition that "under the FHA it is sometimes necessary to dispense with formal equality of treatment in order to advance a more substantial equality of opportunity." *Dayton I*, 2021 WL 5411220, at *9. The jury instructions, viewed as a whole, generally reflect that sentiment. First, the instructions at issue suggest that the jurors should not focus solely on formal equality of treatment. Specifically, they clarify that a benefit is not necessary where it helps disabled and non-disabled individuals to the same extent. *See* Trial Tr., R.175, PageID 4606–07. Second, the instructions later direct the jurors to focus instead on *Cinnamon Hills*'s call for more substantial equality of opportunity. After eschewing a focus on equal treatment, the instructions state that an accommodation is necessary when it "enables [disabled persons] to overcome their disability to obtain . . . benefits." *Id.* at PageID 4607. Read as a whole, the instructions align with *Dayton I*'s approval of *Cinnamon Hills*.

The district court's instructions also generally align with our case law. The necessity element is linked to the FHA's goal of equal opportunity. *Anderson*, 798 F.3d at 361. And in *Anderson* we explained that such equality arises when an accommodation "ameliorates the effects of [one's] disability" so that they can enjoy their residence "as a non-disabled person could." *Id.*; *see also Hollis*, 760 F.3d at 541 ("The necessity element . . . examines whether the requested accommodation . . . would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive."). Similarly, the district court's instruction explained that the central inquiry is whether the accommodation enables a disabled person to overcome their disability.

Freedom's Path presents two main counterarguments. Neither is persuasive.

14

*First*, Freedom's Path accuses the district court of "wander[ing] far from" *Dayton I*'s explanation of when an accommodation is necessary to afford an equal opportunity. But as explained above, the district court's instruction was consistent with *Dayton I*'s statements of law. That the district court did not recite verbatim *Dayton I*'s language does not mean it erred. *See Bucyrus-Erie*, 643 F.2d at 418.

*Second*, Freedom's Path asserts that a familiar accommodation—an elevator in a multi-story building—would be unnecessary under the district court's instruction. Not so. Though an elevator benefits both disabled and non-disabled individuals, it does not do so *equally*—an important qualifier in the district court's instructions. *See* Trial Tr., R.175, PageID 4606–07. For a non-disabled individual, an elevator may have some benefits; convenience comes to mind. But for a disabled individual, the elevator may be an absolute prerequisite to even access a residence. For that reason, the elevator's benefit to those that are disabled far exceeds any a non-disabled person receives. Indeed, only by receiving such a substantial benefit can the disabled person receive the "same enjoyment" as a non-disabled person—an inquiry at the core of the "equality of opportunity" so important to disability claims. *Hollis*, 760 F.3d at 541; *Cinnamon Hills*, 685 F.3d at 293.

### 3. Freedom's Path's Proposed Instruction

In its last challenge to the jury instructions, Freedom's Path shifts gears. It focuses on an instruction that the district court *refused* to include. Freedom's Path wanted the district court to instruct:

> HUD-VASH prioritizes the chronically homeless, who are defined as being an adult head of household with a diagnosable substance use disorder, serious mental illness, developmental disability (as defined in section 102 of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15002)), post traumatic stress disorder, cognitive impairments resulting from a brain injury, or

15

> chronic physical illness or disability, including the co-occurrence of two or more of those conditions.

Pl.'s Proposed Jury Instrs., R.141, PageID 3385. In Freedom's Path's view, that instruction highlights that the homeless veterans it planned to serve were disabled. And by not providing that instruction, Freedom's Path argues that the district court violated the mandate rule and otherwise erred. GDPM counters that the district court did not err because the proposed instruction was misleading and unsupported by the trial record. Even if it was an error, GDPM further alleges it was harmless.

As recognized above, this Court reviews a district court's refusal to provide a jury instruction for abuse of discretion. *Williams ex rel. Hart*, 400 F.3d at 365–66; *Kuehne*, 547 F.3d at 679. We will only reverse if three conditions are met: "(1) the omitted instruction is a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Williams v. Eau Claire Pub. Schs.*, 397 F.3d 441, 445 (6th Cir. 2005) (citing *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 820 (6th Cir. 1999)). To varying degrees, Freedom's Path's proposed instruction fails on every account.

We start with the second condition. Much of Freedom's Path's proposed instruction was substantially covered by other instructions. During the charge, the district court took judicial notice of the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009—Freedom's Path's first exhibit. Trial Tr., R.175, PageID 4599. Among other things, that statute defines what it means to be chronically homeless. *See* 42 U.S.C. § 11360(2). So does Freedom's Path's proposed instruction. Accordingly, the district court did not err in refusing to provide such duplicative information.

That leaves only the portion of the instruction stating, "HUD-VASH prioritizes the chronically homeless." Under the first and third conditions, however, that portion fares no better.

For one, it is unclear whether that proposition is a correct statement of law. As legal support, Freedom's Path initially directed the district court to the VA's website, https://www.va.gov/homeless/hud-vash_elgibility.asp. But Freedom's Path cites no authority for the proposition that text on an agency's website constitutes a "statement of law" in the first place. When asked to do so during oral argument, counsel for Freedom's Path conceded that he could not. Further, it is unclear whether that statement is a correct reflection of the website's content during the relevant time period. The webpage is no longer accessible. And Freedom's Path's only submission of that site's contents indicates that it was last updated on February 19, 2019. That begs the question—what about the legally relevant time period, from roughly 2011 to 2016? *See* Order on Pl.'s Req. for Judicial Notice, R.142, PageID 3409 (refusing to take judicial notice of the VA webpage for this reason). Without this information, we cannot say the district court erred. *See United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006) (explaining that an instruction on a defendant's theory of the case must have "some support in . . . the law" (citation omitted)).

The only other potential "law" that Freedom's Path cites is *Dayton I*. In that opinion, this Court noted that "the very nature of . . . the [HUD-VASH] program aspired to provide supportive services to those with disabilities." *Dayton I*, 2021 WL 5411220, at *8. But it did so while construing the facts in the light most favorable to Freedom's Path. *See id.* at *6. On remand for trial, that construction no longer controls. *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012).

In any event, even assuming Freedom's Path's proposed instruction had some basis in law, the district court's refusal to provide that instruction did not impair Freedom's Path's theory of the

case. Freedom's Path presented evidence describing HUD-VASH's purpose and the residents it serves during trial. Indeed, its principal witness—Craig Taylor—testified that the HUD-VASH program targets homeless veterans, who, in his experience, all possess at least one disability. And with Don Paxton's testimony, Freedom's Path doubled down. Paxton explained that the HUD-VASH program "is for veterans, generally disabled." Trial Tr., R.172, PageID 4165. In sum, even without the proposed instruction, the jury was "already well aware" of Freedom's Path's theory of the case. *Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d 717, 727 (6th Cir. 2006) (citation omitted).

For all these reasons, we find no error in the district court's refusal to provide Freedom's Path's proposed instruction.

## B. Pre-Trial Rulings

Freedom's Path's remaining challenges concern the district court's rulings on various motions in limine. Such rulings are not "lightly overturned." *Nolan v. Memphis City Schs.*, 589 F.3d 257, 265 (6th Cir. 2009) (quoting *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004)). We review them for an abuse of discretion. *Id.* at 264. And even where an abuse of discretion exists, reversal is inappropriate if the error was harmless. *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013).

### 1. Advice-of-Counsel/Advice-of-HUD Defense and Supporting Evidence

Three of Freedom's Path's challenges to the district court's evidentiary rulings are related. Broadly, Freedom's Path argues that the district court erred in denying its motion to exclude evidence that GDPM relied on the advice of counsel or HUD. In Freedom's Path's view, that ruling enabled GDPM to present "de facto" affirmative defenses at trial. More narrowly,

18

Freedom's Path also challenges the district court's admission of two pieces of evidence that it believes buttressed those "de facto" defenses. We begin with the narrower issues.

### a. Gordon Black's Affidavit

Freedom's Path challenges the district court's ruling on GDPM's motion to submit an affidavit from HUD employee Gordon Black at trial. Included as an exhibit to that affidavit was an email that Black sent to Jennifer Heapy on January 6, 2016. Freedom's Path argues that both documents were inadmissible. The district court, however, allowed them. It reasoned that (1) the Federal Rules of Evidence permit GDPM to use the affidavit to authenticate the email, and (2) the email is not offered for the truth of the matter asserted. GDPM generally reiterates those grounds as reasons to affirm.

The district court was correct in both respects. For authentication, Rule 901(a) requires only "evidence sufficient to support a finding that the item is what the proponent claims it is." Black's affidavit meets this threshold by stating that the attachment is "a true and accurate copy" of his email. Mot. Submit Aff., R.138, PageID 3336. Further, Black's email was admissible to demonstrate the impression it left on Heapy. Indeed, during the trial, Heapy testified that the email reinforced her understanding that she could not honor Prude's commitment. That information is relevant to Heapy's belief that Freedom's Path's request was unreasonable.

Freedom's Path lodges three counterarguments. One is waived and the other two are unpersuasive.

Freedom's Path asserts that the district court should have excluded Black's affidavit as hearsay. But other than directing the Court to its district court briefing, Freedom's Path does not explain why. That is not enough to raise the issue on appeal. In *Northland Insurance Co. v. Stewart Title Guaranty Co.*, we held that appellants cannot present arguments solely through

reference to their district court briefing. 327 F.3d 448, 452–53 (6th Cir. 2003). Accordingly, Freedom's Path's argument that the affidavit was hearsay is waived. *See id.*

Even if it was not waived and we further assume it is meritorious, this point does not require reversal. The district court admitted Black's affidavit to authenticate his email. But even without that document, there was still sufficient evidence that the email was authentic. Before presenting the email, counsel asked Heapy, "Is this Gordon Black's email to you on January . . . 6, 2016?" Trial Tr., R.172, PageID 4288. She confirmed that it was. On that basis alone, the jury had sufficient support to believe the email was genuine.

Freedom's Path's other two counterarguments can be disposed of quickly. First, Freedom's Path contends that Black's email was unreliable. But the email's reliability has little effect on the outcome of the case. After all, as described above, his email was not admitted for the truth of the matter asserted. Second, Freedom's Path alludes to Rule 403. The affidavit's admission was unfairly prejudicial, it argues, because Freedom's Path never had an opportunity to cross-examine Black. It further argues that its admission had the potential to mislead and confuse the jury. This concern is overstated. Further, to the extent Freedom's Path suffered prejudice, it was not unfair. Freedom's Path had the opportunity to examine Black by deposing him ahead of trial. In fact, it scheduled a date to do so. As for confusion, we see little risk. In its order granting GDPM's motion to submit, the district court explicitly noted that Freedom's Path could clarify any such issues through Heapy. Freedom's Path took advantage of that opportunity during the trial.

### b. Christopher Green's Testimony

Next, Freedom's Path sets its sights on the district court's denial of its motion to preclude Christopher Green from testifying. Freedom's Path argues that GDPM did not timely disclose Green as a witness. And because GDPM—in Freedom's Path's view—has not demonstrated that

its untimely disclosure was "substantially justified" or "harmless," Freedom's Path contends that Federal Rule of Civil Procedure 37(c) required that Green be prohibited from testifying at trial.

Despite Freedom's Path's arguments, the district court held that Rule 37(c)(1)'s "harsh penalty of mandatory preclusion . . . [was] not warranted." Order on Pl.'s First Mot. Lim., R.137, PageID 3330. As the court saw things, GDPM's untimely disclosure was harmless. In reaching this conclusion, the court reasoned that Freedom's Path knew about Green's role in the underlying dispute long before GDPM officially disclosed its intent to call him as a witness. Additionally, the district court observed that Green's testimony was important to the issues remaining for trial. As explained below, this Court's precedent supports that decision.

Rule 37(c)(1) generally requires district courts to exclude witnesses who a party fails to timely disclose "unless the failure was substantially justified or is harmless." We consider five factors to determine when a late disclosure meets that exception:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (citation omitted).[1] In applying and weighing these factors, this Court affords district courts broad discretion. *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019). After all, the factors seek to separate "honest," harmless mistakes from "underhanded gamesmanship," and district courts stand in a better position than us to make that determination. *See id.* at 219–20 (citation omitted). We consider each factor in turn.

---

[1] As Freedom's Path correctly observes, prejudice to the other party is not one of our considerations under Rule 37. *See Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003). Accordingly, we do not address it here.

21

*Surprise.* Freedom's Path was likely initially surprised to hear on January 12, 2020, that Christopher Green was one of GDPM's potential witnesses. For the preceding three years, Green had served as GDPM's counsel of record. Accordingly, it was fair for Freedom's Path to assume he would not also be testifying at the trial then-scheduled for the end of the month. But the trial did not take place for another two and a half years. Any surprise by then was likely extinguished. Further, while Freedom's Path may have been surprised to hear of Green's new role in the case, it should not have been surprised by the likely substance of his testimony. During her deposition, Heapy testified about Green's involvement in the underlying dispute. This factor slightly favors GDPM.

*Ability to Cure Surprise.* As noted above, the trial did not commence until over two years after GDPM's disclosure. During that time, Freedom's Path could have attempted to depose Green. For what appears to be strategic reasons, it did not. While it is true that the discovery deadline had already passed (roughly a year and a half before then), we strongly suspect that the district court would have granted Freedom's Path leave to take Green's deposition in light of GDPM's late disclosure. In fact, GDPM may have voluntarily tendered Green for a deposition if Freedom's Path had asked. Further, even if the district court did not grant leave, Freedom's Path still had the opportunity to cross-examine Green during trial. *See EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 F. App'x 459, 469 (6th Cir. 2019). This factor slightly favors GDPM.

*Disruption to Trial.* Overall, there is no indication that GDPM's disclosure delayed trial. The trial date appears to have been moved for other reasons, including the first judge's recusal and the second judge's ruling on summary judgment. While the trial technically lasted longer—given the time needed for Green's testimony and cross-examination—we do not view this as a disruption. This factor favors GDPM.

*Importance of Evidence.* This factor pulls in different directions. "The more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure." *Bisig*, 940 F.3d at 220 (citation omitted). Nevertheless, we find that it slightly favors GDPM here. As we explain further in the next section—on "de facto" defenses—Green's testimony is probative of whether Freedom's Path requested a reasonable accommodation on behalf of disabled persons. True, Heapy provided similar context, but Green's testimony adds credence to her story. Further, his testimony rebutted Taylor's on Heapy's understanding of federal regulations.

*Explanation.* GDPM does not explain why it disclosed Green as a witness so late.[2] Additionally, the timing of his withdrawal—three weeks before trial was then-scheduled to begin—is at least somewhat suspicious. This factor favors Freedom's Path.

In sum, nearly all of the *Howe* factors cut against preclusion to at least some extent. On this record, we cannot say the district court abused its discretion in holding that GDPM's late disclosure was harmless.

Freedom's Path's briefing makes two missteps in advocating for the opposite conclusion. First, it narrowly focuses on whether GDPM offered evidence of an "honest mistake." During oral argument, Freedom's Path reiterated its view that such an omission requires exclusion under Rule 37. True, that rule seeks to separate honest mistakes from underhanded gamesmanship. *Bisig*, 940 F.3d at 219. But in making that determination, we consider more than the offending party's explanation. *See Howe*, 801 F.3d at 748. Second, Freedom's Path compares this case to

---

[2] When asked to provide an explanation during oral argument, GDPM instead argued that it timely disclosed Green as a witness under a revised scheduling order. But it could not direct the Court to a specific order in the record, nor does such a citation appear in its appellate briefing. This argument is therefore waived. *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 n.6 (6th Cir. 2008); *Reithmiller v. Blue Cross & Blue Shield of Mich.*, 824 F.2d 510, 511 n.2 (6th Cir. 1987).

*Rowe v. Case Equipment Corp.*, 105 F.3d 659 (6th Cir. 1997) (unpublished table decision). That case, however, is distinguishable. Procedurally, *Rowe* required this Court to assess whether the district court abused its discretion in *precluding*—not admitting—testimony. *See id.* Because the exclusion of relevant evidence is a "harsh remedy," *Bisig*, 940 F.3d at 219 (citation omitted), we believe this distinction in favor of admitting evidence matters. And factually, the disclosure in *Rowe* occurred only two weeks before trial; here, it was ultimately over two years. *See id.*

### c.    "De Facto" Affirmative Defenses

That leaves Freedom's Path's broad challenge to the district court's ruling denying its motion to exclude any arguments or evidence that GDPM relied on the advice of counsel or HUD. It argues that the district court's ruling improperly permitted GDPM to raise a "de facto" advice-of-counsel or advice-of-HUD defense at trial. Such a defense, in Freedom's Path's view, is improper for three reasons. First, GDPM did not plead it as an affirmative defense in its answer to Freedom's Path's complaint. Second, GDPM cannot demonstrate that it meets the defense's requirements. Third, the defense is irrelevant to reasonable-accommodation claims.

We generally agree with Freedom's Path's proposition that an advice-of-counsel defense is inappropriate for this case. Where a defendant—like GDPM here—does not raise an affirmative defense in its answer to the complaint, our precedent generally holds that the defense is waived. *See, e.g.*, *Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546, 550 (6th Cir. 2005). Additionally, the advice-of-counsel defense has little-to-no bearing on reasonable-accommodation claims. Defendants generally use the defense to show that they acted in good faith. *See United States v. Lindo*, 18 F.3d 353, 356–57 (6th Cir. 1994); *see also Zen Design Grp. Ltd. v. Scholastic, Inc.*, 327 F.R.D. 155, 160 (E.D. Mich. 2018). Reasonable-accommodation claims, however, do not require proof of intent—the defendant's good faith is immaterial. *See Hollis*, 760 F.3d at 540.

24

But that still begs the question: Did GDPM actually raise a "de facto" advice-of-counsel or advice-of-HUD defense? If not, the issues outlined above are of no effect. Freedom's Path believes GDPM did. As it reads the record, Heapy testified that she relied on her general counsel and a HUD employee in refusing Freedom's Path's alleged accommodation request. Further, Green testified about his interpretation of the relevant laws, the advice he gave to Heapy, and his opinions on legal questions. GDPM disagrees. It posits that Heapy and Green only testified as fact witnesses on relevant topics, namely that neither understood Freedom's Path to have sought a disability accommodation. The district court sided with GDPM. We must assess whether that determination was appropriate.[3]

Having reviewed the record, we agree with the district court; GDPM did not present a de facto advice-of-counsel or advice-of-HUD defense. To raise that defense, a defendant must demonstrate that it (1) fully disclosed all pertinent facts to counsel and (2) relied in good faith on counsel's advice. *Lindo*, 18 F.3d at 356. Heapy and Green's testimony advanced arguments independent of either of those elements.

Though Heapy recounted that she had reached out to GDPM's general counsel and an employee from HUD following her communications with Craig Taylor, her testimony was not

---

[3] We are skeptical of the premise that a defendant can *ever* impermissibly assert an advice-of-counsel defense "de facto" in reasonable-accommodation claims. During argument, Freedom's Path noted that there are "relatively few cases" addressing its "de facto" defense theory. Oral Argument, 10:12–10:20. Indeed, Freedom's Path's briefing cites only one case for that proposition—*In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91 (S.D.N.Y. 1993). Aside from being an out-of-circuit, district-court case, *Bairnco* involved a markedly different situation. There, the implicit advice-of-counsel defense had potential ramifications for a consequential issue in the case: whether the defendant could rely on the attorney-client privilege. *Id.* at 99–100. Meanwhile, the defense is irrelevant to this case's outcome because the defendant's intent is immaterial. So even if a jury considered that defense, it is not clear what (if any) impact it would have. Plus, if anything, *Bairnco* seems to endorse "de facto" defenses, rather than forbid them as impermissible. Therefore, it is unclear whether *Bairnco* carries any force in this appeal.

25

presented to show reliance. Indeed, contrary to Freedom's Path's representation, at no point did *anyone* testify that Heapy "relied on" Green or Black when refusing Freedom's Path's request. Instead, the testimony on this topic was offered to explain the context behind Heapy's decision to contact Green and Black. Heapy testified that she merely sought insight regarding what GDPM's administrative plan allowed under federal regulations. But she never asked if GDPM could amend its administrative plan. Green's testimony added credence to Heapy's. For example, he testified that when Heapy spoke with him, she did not indicate that Taylor had requested an accommodation on behalf of disabled persons. Without this testimony, a reasonable juror might conclude that because Heapy reached out to people familiar with disability accommodations, she might have interpreted Freedom's Path's communications as a request for one. Accordingly, Heapy and Green's challenged testimony was relevant for a purpose other than showing reliance on the advice of counsel or HUD. The district court, which reached a similar conclusion, did not err.

Freedom's Path's best counterargument is that Green opined on legal questions, and that such testimony is "justified only as part of an advice-of-counsel defense." Appellant's Br. 28. But that argument fails for two different reasons. First, Freedom's Path opened the door to testimony concerning the relevant law. During Freedom's Path's case-in-chief, Taylor indicated that he disagreed with Heapy's interpretation of the regulations. Second, Green did not actually provide his legal opinion; he only testified to his general understanding of the laws. When counsel for GDPM tried to elicit information that went further, the district court sustained Freedom's Path's objection that the testimony called for a legal conclusion.

### 2. Evidence on Prospective Tenants

Freedom's Path next argues that the district court erred in denying its motion to exclude argument or testimony that none of its prospective tenants were disabled. Freedom's Path contends

that such individualized proof is relevant only to claims brought by individuals—not entities. The district court disagreed. It reasoned that such information may be relevant to Freedom's Path's claim and GDPM's defenses. On appeal, GDPM partially adopts the district court's position and argues that the evidence was relevant to its defense. Our inquiry, therefore, is limited: Was the information relevant to GDPM's defense? Though this case presents a close call, we conclude that it was.

Relevancy is a low bar. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) ("The standard for relevancy is 'extremely liberal' under the Federal Rules of Evidence." (quoting *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006))). It requires only that evidence has "any tendency to make a [consequential] fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. The evidence need not be dispositive. *Dortch*, 588 F.3d at 401. Indeed, the consequential fact may still seem "quite improbable." *Id.* (quoting Edward W. Cleary et al., *McCormick on Evidence* § 185 (3d ed. 1984)). However, so long as the evidence proffered "advance[s] the ball," that is enough. *Id.*

Here, testimony and argument that Freedom's Path's project lacked a specific disabled tenant advances GDPM's defense. As part of its prima facie case, Freedom's Path needed to prove that GDPM "knew or should have known" that its project's proposed tenants were disabled. *See Hollis*, 760 F.3d at 541 (reciting that an FHA reasonable-accommodation plaintiff must show "the defendant knew or should have known of the disability at the time of the refusal"); Trial Tr., R.175, PageID 4606. Freedom's Path attempted to do so by offering evidence that its references to the HUD-VASH program in communications with GDPM implied that the project would house the disabled. One way Freedom's Path could have bolstered its argument was by identifying a specific prospective tenant who was disabled. That evidence would make it more probable that those who

qualify for HUD-VASH vouchers are disabled. But Freedom's Path did not (and apparently could not) present any such evidence. GDPM eliciting testimony emphasizing this omission decreases the odds that the jury would accept Freedom's Path's argument. The absence of this evidence made it less likely that GPDM knew or should have known that the population Freedom's Path intended to serve was primarily disabled. *See Dortch*, 588 F.3d at 400; *see also United States v. Poindexter*, 942 F.2d 354, 360 (6th Cir. 1991). Admittedly, we do not think GDPM clears relevancy's low bar with significant room to spare. But the fact that it clears the bar confirms that the district court did not err.

Freedom's Path counters that GDPM's briefing is disingenuous. It argues that GDPM did not actually use this evidence as a defense but instead to challenge Freedom's Path's standing to sue under the ADA and FHA. Freedom's Path further argues that entities can prove standing without individualized information as to a prospective tenant's disability. Were we to agree that GDPM actually challenged standing during trial, we might be inclined to accept this argument. After all, in *MX Group, Inc. v. City of Covington*, we held that an entity need only *generally* show that it serves or is otherwise associated with disabled persons. 293 F.3d 326, 335–36 (6th Cir. 2002). But we do not make it that far.

None of Freedom's Path's record citations demonstrate insincerity by GDPM. First, Freedom's Path directs us to the district court's final pretrial order. However, that document reinforces the proposition that GDPM used the information for its defense. It posits that GDPM's second defense is that Freedom's Path "cannot establish a prima facie case" because it has no evidence that any of its prospective tenants were disabled. Final Pretrial Order, R.143, PageID 3413. Second, Freedom's Path cites GDPM's earlier motion to dismiss. To be sure, GDPM does argue there that Freedom's Path lacks standing. But this is no smoking gun. GDPM

28

submitted that motion over five years before trial, and it is entirely plausible (perhaps likely) that GDPM later abandoned this argument.

Freedom's Path also counters that the admitted testimony and argument prejudiced its case and likely confused the jury. Even assuming that is true, we are unconvinced that any such prejudice or confusion *substantially outweighed* the evidence's probative value. *See* Fed. R. Evid. 403. As explained above, the evidence is probative because it bears on whether GDPM knew or should have known that Freedom's Path's prospective tenants were disabled. The lack of any such information goes directly to GDPM's (lack of) knowledge. And we are hard-pressed to find much potential undue prejudice or confusion, as the issue of standing was not before the jury.

### 3. Evidence on Freedom's Path's Damages

Freedom's Path's last evidentiary challenge concerns the district court's ruling limiting its presentation of damages. Freedom's Path wanted to admit evidence of over $21 million in economic damages. The district court, however, limited Freedom's Path to damages that were "direct consequences of any proven discrimination." Order Limiting Damages, R.133, PageID 3293. There is no need for us to review that decision. The jury returned a defense verdict. And we now hold that the district court did not err on the merits. Accordingly, as both parties concede, the issue of damages is moot. *See Williams v. Gen. Elec. Co.*, 145 F. App'x 535, 542 (6th Cir. 2005).

### C. Cumulative-Error Doctrine

One last thing. In its reply brief, Freedom's Path argues that the cumulative effect of its alleged errors requires reversal. True, this Court has previously held that we should "consider the 'combined effect' of multiple trial errors" when deciding whether reversal is appropriate. *Beck v. Haik*, 377 F.3d 624, 644–45 (6th Cir. 2004) (citation omitted), *overruled on other grounds by*

*Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc). However, that doctrine offers Freedom's Path no solace. As GDPM's counsel acknowledged during oral argument, the cumulative-error argument was not adequately raised because it did not appear in Freedom's Path's initial brief. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("[A]rguments made to us for the first time in a reply brief are waived."). Further, the cumulative-error doctrine does not warrant reversal here because we have not identified any individual errors. *See United States v. Cramer*, 491 F. App'x 520, 529 (6th Cir. 2012) (citing *United States v. Wheaton*, 517 F.3d 350, 372 (6th Cir. 2008)).

## III.    CONCLUSION

For the foregoing reasons, none of Freedom's Path alleged errors warrant reversal. We **AFFIRM**.